## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                               Criminal No. 03-1744 WJ (ACE)

FRANCISCO A. MARIANO,

      Defendant.

## MEMORANDUM OPINION AND ORDER
## GRANTING MOTION TO SUPPRESS

THIS MATTER comes before the Court upon Defendant's Motion to Suppress

Statements, filed July 2, 2004  **(Doc. 34)**.  Defendant moves to suppress as evidence any written,

oral or other communications including diagrams and letters, whether inculpatory or exculpatory,

made by Defendant to law enforcement officials during the interrogations on or about March 18,

2003.  Defendant has been charged with aggravated sexual abuse of a child, in violation of 18

U.S.C. §§ 1153, 2241(c) and 2246(2)(C).  Mr. Mariano contends that he did not effectively waive

his rights against self-incrimination, due to his diminished mental capacity.  A hearing was held on

the matter on August 16 and 17, 2004. Having heard the parties' arguments, and reviewed the

parties submissions and applicable law, I find that Defendant's motion is well-taken and will be

granted.

### Background

On March 17, 2003, Agent Augustine Abeita from the Bureau of Indian Affairs ("BIA")

contacted Mr. Mariano by telephone to arrange for Defendant to come in and be interviewed

about a case.[1]    See, Tr. at 62-65.  Soon after his work shift ended on the early morning of March

18th, Mr. Mariano drove himself down to the BIA office.  He was met by Agent Abeita and

Agent Travis Witt from the Federal Bureau of Investigation ("FBI"), who testified that they "felt

it might be best" to read Mr. Mariano his rights, even though he was not under arrest.  Tr. at 17-

18.   The interview concerned allegations of child sexual abuse having been committed by Mr.

Mariano against his daughter Victoria five years previously.[2]  Victoria was between the ages of

two and three at the time of the alleged abuse, although there is some confusion over her exact

age. The agents did not record the interview.  Defendant contends that statements made to law

enforcement officials during this interrogation were made in violation of his Fifth Amendment

right against self-incrimination, as set forth in Miranda v. Arizona, 384 U.S. 436 (1996), and

moves to suppress that evidence.

        Mr. Mariano is described as borderline mentally retarded with extreme verbal deficiencies.

Testimony touching on this subject was given by Elliot Rapoport, Ph.D., a clinical psychologist;

Edwin Mariano, Defendant's father; Karen Salazar, Defendant's special education teacher from

grades seven through twelve; and Jose Rivera, Defendant's former job supervisor as a casino

security guard.

**Discussion**

_____

    [1]  Defendant testified that he believed that the request to come in and be interviewed was related to his child custody case, since he was trying to regain custody of his children during that time.

    [2]  Notwithstanding the serious allegations of child abuse, BIA officials delayed investigating these allegations for approximately five years until finally referring the matter to the FBI.  It is very disturbing to the Court that BIA officials would do nothing for five years about serious allegations of child abuse.

Under Miranda v. Arizona, police are required to inform criminal suspects about their rights to remain silent and to counsel before interrogating the suspect.  Miranda requires that procedural safeguards be administered to a criminal suspect prior to "custodial interrogation."  U.S. v. Perdue, 8 F.3d 1455, 1463 (1993) (quoting Miranda, 384 U.S. at 444).  A statement taken during a custodial interrogation in violation of the Miranda rule cannot be admitted at trial to establish the defendant's guilt.  Berkemer v. McCarty, 468 U.S. 420, 429 (1984).  However, the protections afforded under Miranda apply only where a suspect is in custody, and when the questioning meets the legal definition of "interrogation."  Perdue, 8 F.3d at 1463.

A person is "in custody" when he has been deprived of his freedom of action in any significant way. Id. (quoting Miranda v Ariz., 384 U.S. at 444).  The relevant inquiry with regard to custody is "how a reasonable man in the suspect's position would have understood his situation." Id  (quoting Berkemer, 468 U.S. at 442).  Concerning the second requirement, "interrogation" includes "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id. (quoting Rhode Island v. Innis, 446 U.S. 291, 301 (1980)); Abraham v. Kansas, 67 Fed.Appx. 529, 533 (10th Cir. 2003).  Thus, the applicability of Miranda to Defendant's statements rides on whether he was in custody *and* was being formally interrogated at the time he was interviewed by the agents.

## I.     Whether Defendant was in custody

The Government's argument against a finding that Defendant was in custody seems plausible enough.  The Defendant drove himself to the BIA office, left the same way he came, and remained free to go about his own business after the interview for another five months.  However,

there is evidence that during the interview, Defendant's status changed.

An individual is not "in custody" for purposes of Miranda unless his "freedom of action is curtailed to a degree associated with formal arrest." U.S. v. Bennett, 329 F.3d 769, 774 (10th Cir. 2003); Perdue, 8 F.3d at 1463 (a person has been taken into police custody whenever he has been "deprived of his freedom of action in any significant way") (quoting Miranda, 384 U.S. 436). The proper perspective for determining whether a suspect is in custody at the time of questioning is whether a "reasonable [person]" in the suspect's position would have understood his situation ... as the functional equivalent of formal arrest." Id. at 442 (quoting California v. Beheler, 463 U.S. 1121, 1125, (1983) (per curiam) and Miranda, 384 U.S. at 444)); U.S. v. Erving L.,147 F.3d 1240, 1246-47 (10th Cir. 1998).   The "ultimate inquiry," is "whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Beheler, 463 U.S. at 1125.  "Custody" is determined objectively, asking the question: would a reasonable person have understood his situation to be comparable to a formal arrest? Berkemer, 468 U.S. at 441-42, U.S. v. Griffin, 7 F.3d. 1512, 1518 (10th Cir. 1993).

It is clear that Defendant was not in custody at the onset of the interview, which lasted two hours in its entirety.  However, Defendant described one point in the questioning, after repeatedly denying abusing his daughter, when he felt he was not free to leave.  He recalls that when he pushed his hand down on the table preparing to get up and leave, Agent Abeita "grabbed [his] hand, pushed it down" and told Defendant that he was "going nowhere."  The agents then told him that he was going to be arrested and taken to jail.  (195-96).[3]  Agent Witt testified that

---

[3]  Page numbers in the hearing transcript are in parentheses.

Defendant was not in custody because he was never actually arrested.[4]  He stated that Defendant was "offered an opportunity" to write a note of apology to his daughter, which would "reflect good on him" if he did so.[5]   Agent Witt denies telling Defendant he would be taken to jail if he did not write the note.  (277).

Unfortunately, there is no recording of the interview to aid the Court in its factual determinations.  The question here is how a reasonable person in Defendant's position would have understood his situation.  Berkemer, 468 U.S. at 442t. at 1351.  In the context of the situation as described by Defendant, he could have reasonably believed his freedom of action had been curtailed to a degree associated with a formal arrest. The Government focuses on the fact that Defendant came in of his own volition, and ultimately left a free man, remaining in this status for the next several months.  However, at one point in the interview, when Defendant tried to leave, he was physically prevented from doing so.  I find Defendant's recounting of the event to be credible.  Agent Witt's statement that Mr. Mariano was free to go "after he wrote the note" (277) does not contradict Defendant's statements about being physically restrained from leaving.

The case of U.S. v. Erekson 70 F.3d 1153 (10th Cir. 1995) is helpful, if only by contrast. In that case, defendant came to the interview voluntarily and was free to leave at any time. No force or threat of force was used to compel his attendance at the interview or to keep him there once he had arrived.  Erekson was permitted to tape record the interview; knew that he was not the "focus" of the interview and that he was not a suspect in any criminal investigations at the time of the interview.  Under those circumstances, a reasonable person would believe he was free

---

[4]  Agent Abeita was not called as a witness at the hearing.

[5]  It is this note of apology which the Government seeks to use as a confession.

to leave, and Erekson did just that.  It was also noted in <u>Erekson</u> that the defendant "was not unusually susceptible to coercion because of his age, lack of education or intelligence."  70 F.3d at 1157.  The Court found that Erekson was not in custody during the time he was questioned.

Mr. Mariano's situation is more like that of the defendant in <u>Abraham v. Kansas</u>, 67 Fed.Appx. 529, 533 (10th Cir. 2003).  While the defendant in that case was not in custody when he was first interrogated, his situation changed when he was informed that he could not leave until the officers obtained more information.  This is what happened to Mr. Mariano.  It was made clear to him that he would not be free to go until and unless he wrote the "letter of apology" to his daughter.  Thus, I find that Defendant was in custody during the time he made the statements at issue to the agents.

## III.    Was Defendant "Interrogated"?

Under Miranda, the term "interrogation" refers "not only to express questioning, but also to any words or actions on the part of the police . . .  that the police should know are reasonably likely to elicit an incriminating response from the suspect." <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301 (1980); <u>U.S. v. Mullen</u>, 95 Fed.Appx. 259, 260 (10th Cir. 2003).

According to Agent Witt, Defendant maintained his innocence for almost the entire interview. (69)  I find that Agent Witt's efforts to get a statement from Defendant, seeking to elicit admissions of sexual abuse of his daughter via a "letter of apology," could fairly be described as an interrogation for <u>Miranda</u> purposes.  (72-73).  Thus, because Defendant was in custody and being interrogated during the time he made the challenged statements and communications to the agents, <u>Miranda</u> applies to those statements and communications.

### III.    Waiver of <u>Miranda</u> rights

In order to be effective, a waiver must be made "voluntarily, knowingly, and intelligently."

<u>Miranda</u>, 384 U.S. at 444.  A court's inquiry into a waiver's validity has two "distinct dimensions."

<u>Smith v. Mullin</u> 379 F.3d 919, 932-33 (10th Cir. 2004).  First, the relinquishment of the right

must have been voluntary in the sense that it was the product of a free and deliberate choice rather

than intimidation, coercion or deception. Second, the waiver must have been made with a full

awareness of both the nature of the right being abandoned and the consequences of the decision

to abandon it.  Only if the totality of the circumstances surrounding the interrogation reveal both

an uncoerced choice and the requisite level of comprehension may a court properly conclude that

the Miranda rights have been waived.  <u>Id</u>.  Further, the Government has the burden of showing

"both an uncoerced choice and the requisite level of comprehension."

<u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986);  <u>U.S. v. Hernandez</u>, 93 F.3d 1493, 1501 (10th Cir.

1996).

Defendant's mental status is relevant to this inquiry.  Testimony given by several

individuals -- a clinical psychologist, a special education teacher, Defendant's father and a former

job supervisor -- corroborates Defendant's mental deficits.  These deficits affected all phases of

Defendant's life.  His Intelligence Quotient ("I.Q.") is in the borderline mentally retarded range,

and his Verbal I.Q., also in the same range, places him in the bottom percentile of the general

population.[6]  Deficits in Defendant's expressive and memory skills required close supervision and

guidance during his school years, and do not improve as he matures.  According to his former job

supervisor, Defendant could ultimately grasp what he needed to know in his job as a casino

---

[6] Exhibits supporting the witnesses' testimony were admitted at the hearing.

security guard, but someone needed to break down information into very simple terms.  While the Government does not challenge the existence of Defendant's mental deficits, it does challenge the impact they had on Defendant's ability to waive his <u>Miranda</u> rights.

A.     <u>Voluntariness of waiver</u>

        Whether a confession was voluntary depends upon the "totality of the circumstances," including elements of police coercion, length of the interrogation, the defendant's maturity, education, physical condition and mental health, and the failure of the police to advise the defendant of his rights to remain silent and to have counsel present during the custodial interrogation. <u>Withrow v. Williams</u>, 507 U.S. 680, 693-94 (1993).  The Government has the burden of proving that the waiver was voluntary.  <u>U.S. v. Toro-Pelaez</u>, 107 F.3d 819, 825 (10th Cir. 1997).  The ultimate question is whether the confession was "the product of an essentially free and unconstrained choice."  <u>Trice v. Ward</u>, 196 F.3d 1151, 1169 (10th Cir. 1999).  No single factor is determinative; instead, the court making the determination must be mindful of all surrounding circumstances, including a defendant's characteristics.  <u>U.S. v. Short</u>, 947 F.2d 1445, 1449 (10th Cir. 1991) (citing <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226 (1973)).  Familiarity with the criminal justice system is also a factor in establishing the voluntariness of a waiver. <u>United States v. Cruz-Jimenez</u>, 894 F.2d 1, 8 (1st Cir.1990) (evidence of valid waiver when defendant arrested five times before).

        Defendant's mental status is relevant to this inquiry, but not necessarily dispositive. <u>Nickel v. Hannigan</u>, 97 F.3d 403, 410 (10th Cir. 1996) (analyzing under Fourteenth Amendment due process).  In the end, to find that Defendant's confession is involuntary, I must find that it was the result of "coercive police activity." <u>Id</u>., at 410 (holding that petitioner's mental condition,

8

without evidence of police coercion, did not alone make his statements to the police involuntary);
(citing Colorado v. Connelly, 479 U.S. 157, 167 (1986) (coercive police activity is a necessary
predicate to the finding that a confession is not voluntary); U. S. v. Robertson, 19 F.3d 1318,
1321 (10th Cir.1994) ("police must somehow overreach by exploiting a weakness or condition
known to exist"); U.S. v. Chrisman, 965 F.2d 1465, 1469 (7th Cir.1992) (diminished mental state
"is only relevant to the voluntariness inquiry if it made mental or physical coercion by the police
more effective").

Agent Witt took only three minutes to read Defendant the Advice of Rights form, and
offered Defendant "the opportunity to read along. . . ." (58). The agents did not seek to ascertain
whether Defendant understood what was being read to him, despite the fact that they were aware
that he was a product of special education classes. Defendant testified that he was confused
throughout the interview. He was interviewed when he was tired, just after he had completed a
work shift. In fashioning the note of apology to his daughter, he did not instruct the agents to
include the word "ointment" because he was "confused" and not "thinking right." (238). He
"kept on telling" the agent that his daughter had a diaper rash, and that he had applied medication
that was prescribed for the rash, but they did not give him a chance to explain. (227).

There is reason to at least consider the element of coercion in this case: rapid-fire
questions put to Defendant despite his rather plodding mental demeanor; their success (only after
an hour and a half into the interview) in eliciting a statement which contradicted Defendant's
earlier statements that he had touched his daughter while applying ointment to her diaper rash
(229); inconsistencies in Agent Witt's recall of Defendant's mention of ointment, which Witt
himself stated would have been important (282). Defendant testified that the agents "forced" him

9

to write the note of apology (201), and that they told him what to write. (237).  They informed him that writing the letter of apology would help him stay out of jail, and that he would be arrested if he "didn't do what they told me to do on that apology letter." (259).  Defendant understood the agents' encouragement to him to write a "pertinent" letter of apology to his daughter (72-74) as a requirement before he would be able to leave (270).

Presence of a mental impairment will require a "lesser quantum of coercion" to render a confession involuntary.  United States v. Sablotny, 21 F.3d 747, 752 (7th Cir.1994) (cited in Nickel, 97 F.3d at 410).  Mr. Mariano's mental status no doubt rendered him particularly susceptible to the agents' conduct.  However, Defendant's state of mind does not conclude the due process inquiry into the voluntariness of his statements.  Nickel, 97 F.3d at 410. Rather, the inquiry requires an examination of the totality of the circumstances.  Haynes v. State of Wash., 373 U.S. 503, 513 (1963).  In that broad context, the agents' conduct does not rise to the level where it constituted overreaching, or where the agents took advantage of Defendant's mental slowness as a tool to elicit the information and statements given by him.  See, e.g., Thompson v. Cox, 352 F.2d 488, 489 (10th Cir.1965) (petitioner's confession to police was voluntary where there was no evidence that any information gained by police from the lie detector test or the interrogation of the petitioner while he was on medication "was used as a tool to influence petitioner's final decision to tell of his participation in the crime"); United States v. Robertson, 19 F.3d 1318, 1321 (10th Cir.), cert. denied, 513 U.S. 906 (1994) (for confession to be involuntary, "the police must somehow overreach by exploiting a weakness or condition known to exist"); United States v. Guerro, 983 F.2d 1001, 1004 (10th Cir.1993).  And while it would be fair to say that Defendant had not before found himself in a situation where he was being questioned at

10

considerable length after being read his rights, his several DUI arrests made him no complete stranger to the system (24).

There is a question as to whether Mr. Mariano's mental level precluded him from completely understanding what was being read to him from the Advice of Rights form.  Yet I do not find that there was police coercion at the level which would make Defendant's waiver of rights involuntary.  However, what is more problematic is the issue of whether Mr. Mariano's statements were made subsequent to a knowing and intelligent waiver of his <u>Miranda</u> rights, which is the focus of Defendant's argument.

B.      <u>Whether waiver was knowing and intelligent</u>

Defendant does not claim that he lacks the ability to understand his <u>Miranda</u> rights, but rather that he did not understand them as read to him in the amount of time in which they were read.  For a waiver to be knowing and intelligent, it "must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." <u>U. S. v. Morris</u>, 287 F.3d 985, 989 (10th Cir.2002) (quoting <u>Colorado v. Spring</u>, 479 U.S. 564, 573 (1987)); <u>U.S. v. Hernandez</u>, 93 F.3d 1493, 1501 (10th Cir. 1996) (waiver of Fifth Amendment rights requires both an uncoerced choice and the requisite level of comprehension). Here, again, Defendant's mental capacity is relevant to whether he was capable of such a waiver. <u>Smith v. Mullin</u>, 379 F.3d at 932.

Defendant contends that statements obtained during the interrogation must be suppressed because he did not knowingly and intelligently waive his <u>Miranda</u> rights.  The Government maintains that even if the Defendant was in custody, waiver of his Fifth Amendment rights was valid.  It contends that Defendant's claim of "simple-mindedness" is not supported by the

evidence, pointing to Mr. Mariano's "impressive composure" in the courtroom and during cross-examination; his ability to master numerous security codes during his job as security guard; and his apparent mastery of certain idiomatic phrases.   The Government also maintains that Defendant was always free to tell the agents to slow down, or to make sure that they included important words (like "ointment") in the letter of apology while he was composing the note.

It is misleading to use Defendant's presence in the courtroom at the hearing as an indicator of his level of comprehension or mental functioning.  By the time of the hearing, Defendant had time to review with counsel expected areas of questioning, both on direct and cross-examination, and had counsel's help in reviewing the Advice of Rights form at considerable length.  I also agree with Defendant that the Government has somewhat overstated the significance of some of the concepts Defendant was able to handle.  Defendant did not need to master over 100 codes for his job as security guard.  Although guards needed to be familiar with what the different codes meant, the casino used only about ten codes.  (101, 247).  These ten codes did not need to be memorized, as they were listed on a miniature card handed out to all the security guards, including Defendant. (105).  Defendant's duties in his former job as a short-order cook in a bowling alley snack bar were limited to warming up pizza and frying hamburgers.   Even so, Defendant recalled that when he worked there, he needed to take his time with "confusing" orders so he would get the orders right (248-49).  As to the Government's contention that Defendant could have told the agents to slow down during the time he was writing the letter of apology (239),  Defendant said that when he did so, they "wouldn't listen to me. They would jump to another question." (261).

I am not persuaded that Defendant waived his rights against self-incrimination with a full

awareness of what he was giving up.  Defendant believed that the letter of apology  was just going to his daughter, not that it was a formal statement, and so wrote the letter "[j]ust to get out of there. . . ."  At 229.

In sum, based on the totality of the circumstances surrounding Defendant's interrogation, and on the evidence and testimony admitted at the hearing, I conclude that Defendant did not knowingly and intelligently waive his rights.  Agent Witt testified that the whole process of reading the Advice of Rights Form took two to three minutes.[7]  Agent Witt could not recall whether Defendant had any questions about the form, did not break down or otherwise change any of the language into a more common form, and did not ask whether he understood what was being read, despite knowing that Mr. Mariano had attended special education classes.  Mr. Mariano's demeanor in the courtroom was consistent with someone who mentally takes a bit longer to "catch up" to what is being said, and to process information being presented.   The Court's apprisal of Defendant's demeanor on the stand also comports with the information given by witnesses who testified as to Defendant's mental functioning.  Defendant's motion will therefore be granted.  Given that my determination rests on Fifth Amendment grounds and on violations of <u>Miranda v. Arizona</u>, I need not address Defendant's other theories argued in his brief.

**THEREFORE,**

**IT IS ORDERED** that Defendant's Motion to Suppress Statements **(Doc. 34)** is hereby GRANTED in that any written, oral or other communications including diagrams and letters,

---

[7]  This assumes that Defendant *was* in fact read his rights, and not -- as Defendant claims -- given some form to sign as he was leaving (259).

whether inculpatory or exculpatory, made by Defendant to law enforcement officials during the interrogations on or about March 18, 2003 are SUPPRESSED.

_____

UNITED STATES DISTRICT JUDGE